IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: ) | |
| ) | |
| LISA MARIE McGINNIS, ) | Case No. 16-40158-13-abf |
| ) | |
| Debtor. ) | |
| ) | |
| MISSOURI FAMILY SUPPORT ) | |
| DIVISION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No. 16-4044-13-abf |
| ) | |
| LISA MARIE McGINNIS, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION**

The Missouri Department of Social Services, Family Support Division (the "DFS"), filed this adversary proceeding against Debtor-Defendant Lisa Marie McGinnis, asking that an alleged debt for overpayment of food stamp assistance be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B). For the reasons that follow, the Clerk of Court will be ordered to enter Judgment in favor of Debtor-Defendant Lisa Marie McGinnis.

Debtor Lisa McGinnis and her now-ex-spouse, Scott McGinnis, were married in 1992. They have five children together. On October 21, 2005, at a time when Lisa and Scott were living together, they made an Application for Food Stamp Benefits with the DFS. The Application listed themselves and the five children as members of the household. At that time, Lisa was not employed, and Scott reported wages of $1,382.04 per month. Based on this income and the other

financial information supplied by the McGinnises, the DFS provided the McGinnises with food stamp benefits in the amount of $259 per month for November and December 2005, and $722 per month for January through April 2006.

The DFS representative testified that, when a person applies for food stamp benefits, the applicant is informed that he or she must report any change of circumstances to the DFS. According to the DFS representative, Lisa reported on January 4, 2006, that Scott had left the residence, which would explain why her benefits jumped from $259 per month to $722 per month. In addition, a food stamp recipient apparently must reapply every six months, and provide updated financial information on the new application.

Thus, on April 13, 2006, Lisa again applied for food stamp benefits for herself and five children, reporting that Scott was no longer a member of the household. Attached to this Application was a statement, handwritten and signed by Scott, stating that he was no longer living at the home; that he was living with friends; and that he was paying Lisa's rent at $850 per month. Lisa listed no income from wages or other sources. Based on the financial information supplied, Lisa continued to receive $722 per month in food stamps from May through October 2006.

On October 25, 2006, Lisa again applied for food stamp benefits for herself and her five children, listing no income, and again not listing Scott as a member of the household. Based on the household financial information submitted, Lisa received food stamp benefits in the amount of $738 per month from November 2006 through April 2007.

On April 30, 2007, Lisa applied for food stamp benefits for herself and five children, listing no income, and again not listing Scott as a member of the

household. Based on the information provided, Lisa received food stamp benefits of $738 per month from May through September 2007, and $772 per month in October 2007. Although the DFS submitted into evidence no Application for October 2007, the evidence showed that Lisa continued to receive food stamp benefits in the amount of $772 from November 2007 through May 2008.

Meanwhile, sometime in late 2007 or early 2008, the DFS became suspicious that Scott had actually been living in the home, and opened an investigation, discussed more fully below. As a result of that investigation, the DFS determined that Scott had been a household member during the time Lisa reported that he was not; that he had wages from employment; and that Lisa had been overpaid food stamp benefits totaling $19,436 as a result of the alleged misrepresentations.

On September 30, 2011, the DFS sent Lisa a letter informing her of the results of the investigation. It asked her to sign a promissory note promising to repay the $19,436 overpayment. It also asked her to sign a waiver which would disqualify her from the food stamp program for a period of twelve months for committing a violation of the program. Lisa did not respond to the letter. Therefore, on January 20, 2012, the DFS issued a Decision and Order disqualifying Lisa from the food stamp program for twelve months based on her alleged misrepresentations that Scott was not living at the home.

Lisa testified that she and Scott were finally divorced in 2014, after a brief reunion between 2010 and 2011. Sometime after 2008, Lisa obtained an Associate's Degree in Science and began working as an emergency medical technician. Scott has been ordered to pay child support, but has not been consistent in doing so.

In February 2014, the DFS intercepted an income tax refund in the amount of $7,133, leaving a balance owed of $12,303. Other than that interception, Lisa has made no payments to the DFS on the overpayment assessment.

Lisa filed a Chapter 13 bankruptcy case on January 25, 2016. The DFS filed this adversary proceeding seeking a determination that its $12,303 assessment for food stamp benefits be declared nondischargeable under § 523(a)(2)(A) and § 523(a)(2)(B).

### *Nondischargeability Under § 523(a)*

Section 523(a)(2)(A) of the Bankruptcy Code provides that a discharge under § 727 does not discharge an individual debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud."[1] In order to prevail on a nondischargeability cause of action for actual fraud under § 523(a)(2)(A), the DFS must prove, by a preponderance of the evidence: (1) that Lisa made representations; (2) that at the time she made the representations she knew they were false; (3) that she made such representations with the intention and purpose of deceiving the DFS; (4) that the DFS justifiably relied on such representations; and (5) that the DFS sustained the alleged loss and damages as a proximate result of the representation having been made.[2]

Section 523(a)(2)(B) excepts from discharge any debt –

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by –

---

[1] 11 U.S.C. § 523(a)(2)(A).

[2] *See In re Ophaug,* 827 F.2d 340 (8th Cir. 1987), as supplemented by *Field v. Mans*, 519 U.S. 59, 116 S. Ct. 437, 444, 133 L.Ed.2d 351 (1995); *In re Moen*, 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999).

\* \* \*

    (B) use of a statement in writing –

        (i) that is materially false;

        (ii) respecting the debtor's or an insider's financial condition;

        (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

        (iv) that the debtor caused to be made or published with intent to deceive . . . .[3]

Again, the person objecting to the discharge of a debt must prove each and every element of the discharge exception by a preponderance of the evidence.[4]

The DFS asserts that Lisa made both verbal and written misrepresentations that Scott was not living in the home and, therefore, the debt should be nondischargeable under both subparagraphs (A) and (B).

### *Collateral Estoppel*

At the outset, although the DFS did not initially plead that collateral estoppel applies, DFS's counsel indicated at a pretrial conference that the DFS planned to make such an argument, based on its Decision and Order disqualifying Lisa from the food stamp program. At that pretrial conference, I suggested that, if the DFS wished to pursue the collateral estoppel argument, it should file a motion for

---

[3] 11 U.S.C. § 523(a)(2)(B).

[4] *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

5

summary judgment. However, in that discussion, I directed counsel to this Court's unpublished ruling in a similar case, *In re Minix*.[5] Thereafter, counsel for the DFS advised the Court that it would not be filing a motion for summary judgment.

Because my reference to *In re Minix* may have caused the DFS to abandon its collateral estoppel argument, a discussion of that case is warranted.

In *Minix*, the United States Social Security Administration (the "SSA") asserted that the debtor there had obtained social security benefits to which she was not entitled, by representing that she was separated from her husband when the SSA asserted she was living with him. The SSA moved for summary judgment on its § 523(a)(2)(A) nondischargeability cause of action, asserting that its administrative assessment against the debtor should be given collateral estoppel effect.

As I stated there, in the Eighth Circuit, the party asserting collateral estoppel must prove:

> (1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit; (2) the issue sought to be precluded must be the same as the issue involved in the prior action; (3) the issue sought to be precluded must have been actually litigated in the prior action; (4) the issue sought to be precluded must have been determined by a valid and final judgment; and (5) the determination in the prior action must have been essential to the prior judgment.[6]

---

[5] *United States v. Minix* (*In re Pauleah DeVaughn Minix*), Case No. 14-60033, Adv. No. 14-6010, *Order Denying Motion for Summary Judgment as to Count One of Plaintiff's Amended Complaint and Setting Trial Date* (Doc. No. 48) (Bankr. W.D. Mo. May 27, 2015).

[6] *In re Porter*, 539 F.3d 889, 894 (8th Cir. 2008) (*quoting Robinette v. Jones*, 476 F.3d 585, 589 (8th Cir.2007)).

I acknowledged in *Minix* that courts, including the Eighth Circuit Bankruptcy Appellate Panel, have given collateral estoppel effect to administrative proceedings.[7]

However, I found that the SSA's assessment in *Minix* was akin to a default judgment because the debtor never responded to the SSA's notices concerning the administrative proceedings.

Although some courts give collateral estoppel effect to true default judgments in nondischargeability actions, many courts do not consider a true default judgment to be a trial on the merits,[8] such that the requirement that the issue be actually litigated is not met.  In Missouri, courts will give collateral estoppel effect where a default judgment followed the striking of an answer as a sanction for discovery abuses,[9] or when the judgment was based on evidence offered by the plaintiff,[10] but courts in Missouri generally do not give collateral estoppel effect to true default judgments,[11] *i.e.*, those in which the defendant does not answer or otherwise participate in the proceeding.

---

[7] *See*, *e.g.*, *In re Horras*, 443 B.R. 159, 168 (B.A.P. 8th Cir. 2011).

[8] *See, e.g.*, *In re Wald*, 208 B.R. 516 (Bankr. N.D. Ala. 1997) (listing states which do, and do not, apply collateral estoppel effect to default judgments).

[9] *See In re Maxey*, 395 B.R. 665, 671 (Bankr. W.D. Mo. 2008) (discussing Missouri law regarding the collateral estoppel effect of a default judgment entered as a sanction for discovery abuses).

[10] *See, e.g., Car Color & Supply, Inc. v. Raffel* (*In re Raffell*), 283 B.R. 746, 749 (B.A.P. 8th Cir. 2002).  *See also Neal v. Surls* (*In re Surls*), 240 B.R. 899, 905-06 (Bankr. W.D. Mo. 1999) (holding that a summary judgment which included detailed findings would be given collateral estoppel effect under the federal standard's "actually litigated" requirement, even though the defendant had not responded to the motion for summary judgment).

[11] *See, e.g., Balloon Society of St. Louis, Inc. v. Graham (In re Graham)*, 272 B.R. 705, 709 (Bankr. E.D. Mo. 2002) ("Absent a specific pre-emption by Congressional or legislative action, a default judgment is normally not given preclusive effect under the collateral estoppel doctrine because no issue has been actually litigated. . . . A default proceeding is not a trial on the merits.") (citations omitted).

In *In re Horras*,[12] the Eighth Circuit BAP held that the bankruptcy court properly gave collateral estoppel effect to an administrative determination. However, that administrative decision resulted from a full hearing at the administrative level and the decision had been reviewed and affirmed by an administrative appellate body as well as the Eighth Circuit Court of Appeals. In contrast to *Minix*, I held, such a decision would clearly satisfy the requirement that the matter was "actually litigated" in the prior action. In addition, in contrast to a default *judicial judgment*, the entity who made the assessment in *Minix* was not a neutral factfinder and, in fact, if the debtor had chosen to appeal the assessment, that entity would have been the debtor's adversary in such appeal. Therefore, I held that collateral estoppel did not apply to the SSA's default administrative decision.

The same would be true here, inasmuch as Lisa never responded to the DFS's notices concerning its investigation. Moreover, in contrast to *Minix* – where it was undisputed that the debtor actually received the notices – Lisa says she did *not* receive the DFS's notices. Those notices were all mailed to Lisa via regular United States mail, and not certified, and were mailed to Lisa at three different addresses,[13] none of which were established at trial as correct addresses for Lisa at the time the letters were sent. In essence, Lisa's testimony that she never received any of the notices was uncontradicted. As a result, for the same reasons enunciated in *Minix*, plus the lack of proof that Lisa had notice, collateral estoppel would not apply here.

---

[12] 443 B.R. 159 (B.A.P. 8th Cir. 2011).

[13] Addresses to which the DFS sent notices included: 7604 N. Olive St., Kansas City, MO, 64118 (Ex. 15); 5130 Hayes St., Shawnee, KS, 66203 (Ex. 17 and 20); 104 Southside, Excelsior Spgs, MO, 64024 (Ex. 18 and 19).

### *The Evidence at Trial*

The threshold question under both § 523(a)(2)(A) and (a)(2)(B) is whether Lisa's representations that Scott was not living at the home between 2005 and 2008 were false.

On that question, Lisa testified that she and Scott (and the children) moved into a home at 740 Spring Circle in Liberty, Missouri, in 2001. That property was owned by Clifford and Marie George, as trustees of the Clifford H. George Trust, (the "George Trust"). The DFS admitted into evidence two leases, dated December 1, 2002 and December 1, 2003 (which were outside of the relevant time frame but were offered to show a history of Scott and Lisa living together), between the George Trust as lessor, and Scott and Lisa as tenants, for the property located at 740 Spring Circle.

Within the relevant timeframe, the DFS submitted a House Lease Agreement between the George Trust and Lisa and Scott McGinnis dated September 3, 2007, again for the lease of the home at 740 Spring Circle. The term of that lease was October 1, 2007 through September 30, 2008, at $850 per month, plus $300 per month to cure a past due amount on the prior leases between the parties. Both Lisa and Scott signed this lease.

Lisa testified that she enjoyed the home at 740 Spring Circle and that the Georges had been kind to her and the children over the years by dropping off diapers and groceries and, evidently, by not evicting them when they got behind on rent. However, she testified that she decided to move in 2007 because they owed the Georges as much as $19,000 in back rent and, since the Georges were elderly, she did not feel she could morally continue to live there while not keeping current with rent.

As a result, on the day after signing the 2007 lease with the George Trust, on September 4, 2007, Scott and Lisa both executed an Application for Occupancy with a different landlord, Ken Bollinger, for a different premises. On September 14, 2007, Lisa and Scott both signed a one year lease with Ken Bollinger, commencing September 17, 2007, and terminating September 30, 2008.

Also on September 14, 2007, Lisa sent a handwritten letter to the Georges, which stated:

> Cliff [and] Marie,
>
> Given the circumstances of Scott[']s job and my lack of employment we have accepted a transfer. The lease we were on was month to month [and] the new lease started on October 1st 2007. We have completely vacated the premises as of today[,] giving you the 15 days notice you required. The amount of money you state we owe you in fact is not correct, and will need to be discussed in further detail. I will send you a forwarding address when one is available to you [sic].
>
> Thank you for the last 7 [years] of tenancy. We enjoyed the house and felt at home. Good luck [with] your son-in-law running things.
>
> Hoping all the best for you [and] your family.
>
>                               Scott [and] Lisa McGinnis
>
> My cell phone will be on for a short period of time.
>
> -- also please be advised we are completely vacated by today 9-14-07 @ 740 Spring Circle Liberty MO 64068.

Lisa testified that she and the children had, in fact, vacated and moved to the new residence on September 14, 2007, but that Scott continued to live elsewhere (she did not know precisely where), even though he had signed the lease with Ken Bollinger.

10

As additional evidence of Scott's residency, the DFS submitted a letter it sent to Scott's employer, the Union Pacific Railroad, as part of its investigation. The letter, dated March 11, 2008, asked Union Pacific to verify, *inter alia*, Scott's employment history, reported residences, and emergency contacts. As relevant here, the employer responded that its records reflected Scott's residential address to be 740 Spring Circle, and that he had income during the relevant timeframe.

As the DFS alleges, Scott's continuing to sign the leases into at least 2007, the handwritten letter to the Georges, and the address used by Scott at Union Pacific are all evidence that Scott was living with the family at that time. However, the DFS representative testified at trial that the DFS did not actually go to the McGinnis residence to verify if Scott or his personal effects were there.[14]

Faced with the documentary evidence of Scott's residence at trial, Lisa explained that Scott was emotionally, verbally, and physically abusive toward her, and was emotionally and verbally abusive toward the children. Two of the children are bipolar and have schizo-affective disorder. At least one of the children is legally deaf, and another child is autistic. The children have behavioral issues, and Lisa testified that Scott's abuse made those issues worse. Lisa testified that Scott left the home on Halloween in 2005, which was ten days after they filled out the October 21, 2005 Application for food stamps where they (accurately) represented that he was a member of the household. Lisa testified that Scott never moved back in until a brief period in 2010, but then moved back out again. They were finally divorced in 2014.

---

[14] At trial, Lisa's attorney objected to the findings and conclusions reached in the DFS reports and decision as to where Scott was living during the relevant time period. Those objections are sustained but, in any event, in view of the evidence offered at trial, the conclusions are entitled to no weight.

Although Lisa is now working as an emergency medical technician, she testified she was unable to work during the 2005-2008 timeframe. Since she had no income, they had to rely on Scott's income to pay rent, even though he was not living there. She further testified that Scott was not paying child support at the time and was not at all consistent in helping her with the rent, despite his promise to do so. Hence, they got significantly behind in paying rent to the Georges. Lisa testified she had to get help from relatives and charitable organizations during this time period, in addition to the food stamps she was receiving.

Lisa testified that Scott signed the 2007 Application for Occupancy and the lease with Ken Bollinger, even though he was not living with the family, because Lisa believed no landlord would rent to her when she had no income. As to the "we've-moved-out" note to the Georges, Lisa testified that she used the term "we" and signed the letter in both their names because he had, in fact, lived there for several years before moving out and the Georges had been kind to them as a family.

With regard to Scott's continuing to list the 740 Spring Circle address with his employer after he had moved out, Lisa testified that Scott told her he was doing that because it would affect his *per diem* rate with the railroad and, since he was essentially couch-surfing, he did not want his employer to think he was unstable. He also had to have a consistent address for insurance purposes.

Lisa's explanation for Scott's signing the Bollinger lease is entirely reasonable: she is very likely correct that no landlord would rent to her and five children when she had no income whatsoever. I also find her explanation for the note to the Georges and Scott's employment address to be plausible.

Moreover, I find Lisa's testimony overall to be credible. Her husband was abusive, she has children with challenges which are exacerbated by his abuse, and I

found her credible that he was living elsewhere (she didn't care where) because of that. Moreover, and significantly, her testimony that Scott was not living there was corroborated by Ken Bollinger's responses to the DFS's investigative questionnaire wherein Mr. Bollinger responded to the question "Did Scott indicate he would be living at the property?" with "I *assumed* he would be,"[15] and "Who lives at the property?" with "The only ones I've seen at the property is Lisa [and] children."

Based on the foregoing, I find that the DFS failed to prove that Scott McGinnis was a member of Lisa McGinnis' household during the relevant time period and, therefore, that it failed to prove Lisa made a misrepresentation – either verbal or written – to the DFS. As a result, the DFS failed to meet its burden of proving that Lisa's debt to it is nondischargeable under § 523(a)(2)(A) or (a)(2)(B). In the event that Lisa receives a discharge, her debt to the DFS will be discharged along with it. An Order in accordance with this Memorandum Opinion will be entered this same date.

Dated:  9/22/16                                    /s/ Arthur B. Federman
                                                      Bankruptcy Judge

---

[15] Emphasis added.